IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

CHRISTY BOUNDS                                                                    PLAINTIFF

v.                                                         CIVIL ACTION NO. 1:24-CV-87-SA-DAS

PROGRESSIVE CASUALTY INSURANCE CO.                                DEFENDANT

ORDER AND MEMORANDUM OPINION

On April 8, 2024, Christy Bounds initiated this litigation by filing her Complaint [2] against

Progressive in the Circuit Court of Winston County, Mississippi. Progressive removed the case to

this Court on the basis of diversity jurisdiction. Now before the Court is Progressive's Motion for

Summary Judgment [71], which is ripe for review. Having considered the parties' filings, as well

as the applicable authorities, the Court is prepared to rule.

*Background*[1]

This lawsuit concerns the termination of Bounds' longstanding employment with Renasant

Insurance, Inc. Renasant is an independent agency that sells, binds, and manages insurance policies

on behalf of insurance carriers, including Progressive.

---

[1] The parties in this case previously sought to file numerous exhibits with restricted access, as well as
redacted memorandums, on the docket. The Court conditionally granted those requests but specifically
advised that any member of the public desiring to view any of the restricted exhibits could request the same
and such requests would be considered on a case-by-case basis. *See* [70], [85]. The Court also specifically
reserved the right to lift the restrictions after having an opportunity to more fully review the exhibits in
conjunction with the parties' arguments concerning summary judgment. Having now had the opportunity
to do so, the Court believes the matter is worth revisiting, as the restriction appears, at least potentially, to
be overly broad. Should the parties believe that the restrictions and redactions should remain in place, they
shall file a separate legal memorandum supporting their position. In doing so, the parties should walk
through each of their respective exhibits and articulate in detail why restricted access is necessary. The
parties are directed to bear in mind the applicable standards for restricting documents, including but not
limited to the Local Rules. The parties shall have 21 days to file these respective memorandums. Should no
memorandums be filed, the Court intends to lift the previously-imposed restrictions.

By way of background, Bounds began working for Renasant as an insurance sales agent at its Louisville, Mississippi location on June 7, 2007. She held that same position with the company until she was terminated more than 15 years later on January 23, 2023.

During her tenure at Renasant, Bounds rated and quoted commercial insurance risks, including construction, excavation, trucking, and logging risks. She bound policies for Progressive, among other insurance carriers. Bounds had authority to rate and bind insurance policies through Progressive's For Agents Only platform. Bounds wrote and bound insurance policies in Mississippi, Louisiana, and Tennessee. According to her, as of 2022, the Progressive policies she had written had generated $4,200,000 in premiums. Bounds estimated that Progressive policies comprised around 40% of her total book of business.

At all pertinent times, Renasant and Progressive had in place a contract ("Producer's Agreement"), pursuant to which Renasant maintains authority to "solicit, provide quotes, receive applications, bind coverage, and collect and provide receipts for premiums for authorized insurance products" on behalf of Progressive. [71], Ex. 2 at p. 13. Under the Producer's Agreement, Progressive may "expand, restrict, suspend, or modify any part or all of [Renasant's] authority hereunder upon written notice[.]" *Id*. Progressive did not have a separate contract with individual sales agents like Bounds, but the Producer's Agreement obligated Renasant and its agents to "use all reasonable efforts to ensure that applications contain complete and accurate information" and comply with Progressive's underwriting requirements. *Id*. at p. 14. Bounds and Renasant had in place a separate employment contract that set forth Bounds' obligations as a sales agent.

In late 2021, Michael Paroda became a Commercial Lines Product Manager for Progressive. In that role, he oversaw some portion of the operations in Louisiana and Mississippi

with the underlying purpose of growing operations consistent with Progressive's profit target. Paroda also maintained oversight over Lakwan Murphy, who held the title of Agency Sales Representative with Progressive, and Ryan Flamma, who was a Product Analyst with the company.

The events pertinent here commenced in mid-2022. On July 18, 2022, Flamma emailed Margaret May, who worked in Progressive's underwriting department, and advised that he and Paroda had "identified a few pieces of our [Louisiana] book that we'd like to audit relating to business class gaming[.]" [80], Ex. 5 at p. 1. For context, Progressive, in its Memorandum [72], explains "gaming" as "manipulating an insured's reported business class to obtain a lower policy premium[.]" [72] at p. 10. Flamma went on to advise May that he and Paroda had identified 40 policies for review that were first quoted as Dirt, Sand, and Gravel ("DSG") risks but were later classified as Excavator risks (which carries a lower premium) when coverage was bound. According to Paroda, "[t]his means that between (1) the quote for a new Progressive insurance policy, and (2) the actual binding of coverage, the insured's reported business class changed from DSG (a higher risk) to Excavator (a lower risk)." [71], Ex. 2 at p. 5. There is no dispute that rating an insured as an Excavator risk when the insured should be a DSG risk violates Progressive's underwriting requirements.

In turn, May emailed Pamela Selvaggio, who worked as a Manager in the underwriting department. May explained the situation and sought "an expert to review [the policies] internally and weigh in on which of these (if any) appear to be DSG." [80], Ex. 7 at p. 1. Richard Glavan, who at the time held the position of Commercial Lines Underwriting Support Coach with Progressive, ultimately conducted a review of the 40 policies. In an email to May and Selvaggio dated August 10, 2022, Glavan provided the following synopsis:

3

> I was able to complete all of these. Of the 40 policies, I was confident in only eight of them actually being excavation. I have 17 policies that should be DSG while 15 I would need more info on them.
>
> I highlighted a few policies numbers for you where I saw AOR 24249, Renasant Insurance, start a new policy as Excavation when the insured was previously active and was rated as DSG. The producer listed on each policy is Christy Bounds. Each instance I saw AOR 24249 became the new AOR. The prior [policies] were typically cancelled by the insured on or after the start date of the new policy starting.

*Id.*, Ex. 9 at p. 1.[2]

May immediately forwarded Glavan's email to Paroda and Flamma. On August 17, 2022, Paroda sent an email requesting that Progressive's underwriting team conduct an agency book review ("ABR") on Renasant's entire book of business.

Bounds first became aware of Progressive's concerns on August 29, 2022. On that day, she received an email from Murphy that listed five policies and noted that "there will be a deeper dive into the excavator policies that you wrote. I don't have the timeframe of when the review will be completed but I encourage you to get ahead of this if you can." [71], Ex. 5 at p. 2.[3]

During September and October 2022, Mike Mitrovic, an Underwriting Support Process Specialist, began the ABR on Renasant's book of business. On October 25, 2022, he returned the results of his initial review of Renasant's policies. Mitrovic explained his work surrounding this initial review as follows:

> As far as my looking at the initial policies on the ones that I would indicate that they need to take a deeper dive into -- like, that policy example you showed previously indicates the word "trucking" in it and had nothing to do with excavating.

---

[2] For clarification, the 24249 number is the agency number that Progressive assigned to Renasant. In other words, references to that number constitute references to the entire Renasant agency.

[3] Based on the wording of the August 29, 2022 email, it seems as though Bounds and Murphy may have had some prior communication on the issue. The Court need not speculate on that point but simply makes that observation for purposes of explaining the underlying facts of the case.

> So it's just the general, like, giving it a once-over, you know, brief peruse of the policy, looking at "trucking" in the name and looking at just having a dump truck on the policy is why I indicated that our specialists would have to take a deeper dive into those policies.

[80], Ex. 10 at p. 18.

In the email summarizing his results, Mitrovic indicated that he reviewed a total of 313 policies and flagged 54 for audit. In the "audit commentary" portion of that summary, Mitrovic explained:

> I have completed a review of the agent's book. There are multiple policies that are not rated as a trucking risk but include trucking in the insured's name. There are a total of thirty-seven policies that I have flagged for a business class review. Ten policies had quote iterations and twenty-two policies have trucking in their name.
>
> There are twenty policies I would like to review for drivers list. Eleven policies flagged for a pointed driver was [sic] quoted and removed prior to bind, these eight policies did not hit our PDD audit, due to the lower than three Progressive Points. The remaining nine policies have vehicle to driver ratio concerns.
>
> Three policies hit for a body type review all for quote iterations and we have two sets of two policies that have the same name.

[71], Ex. 2 at p. 48.

For context, in his deposition, Mitrovic provided an explanation of a quote iteration:

> Q.  What is -- what is a quote iteration?
>
> . . .
>
> A.  It'll determine when the agency did the quote, you know, did they change any information on there. So could they have changed the person who they ran credit on? Could they have changed the vehicle body type? Could they have changed the business classification on there?
>
> So a lot of times, you know, so what we're going to look at is, you know, was there any kind of -- you know, did -- and -- and what we're looking for really is, you know, was it rated as a for-hire transportation, a trucking-for-hire

5

> company but it was ultimately bound as an excavation company. Doesn't mean that they shouldn't be an excavation company, but it gives an indication, like, why was it changed -- why -- why did you go from trucking to excavation or excavation to trucking.

[80], Ex. 10 at p. 25.

Although iterations are not in and of themselves improper, they can, according to Progressive, be indicative of gaming.

In a response email dated November 1, 2022, Paroda advised the underwriting team to "move forward with sending memos to the insured for Bus[iness] Class, Body Type, and [Unlisted Drivers] — taking action as [Mitrovic] detailed [in the previous email] based on how the insured responds." [71], Ex. 2 at p. 57.

Around the same time, Progressive decided to suspend the entire Renasant agency from writing any new Progressive policies for a period of 60 days. On November 14, 2022, Murphy emailed Steve Roberts, who managed Renasant's Louisville, Mississippi office and was also Bounds' supervisor, to advise him of the suspension. In the email, on which Bounds was copied, Murphy explained that Progressive had "completed an audit of policies written under agency code 24249" and "discovered several red flags indicative of gaming." [71], Ex. 8 at p. 22. The email went on to explain that Renasant agents would not be authorized to write new policies but would maintain access to the For Agents Only platform to service existing policies.

Over the following weeks, Progressive conducted a more detailed review of the policies that Mitrovic flagged.[4] This process involved, as alluded to in Paroda's November 1, 2022 email, sending out documentation to the insureds to gather more information directly from them.

---

[4] Although Mitrovic initially flagged 54 policies, Paroda explained in this declaration that in a subsequent email dated November 11, 2022, he asked Mitrovic to expand the policy review slightly further, which resulted in a total of 67 policies being more closely reviewed. *See* [71], Ex. 2 at p. 8.

According to Paroda, Progressive then ultimately determined that 29 of the policies required further action—specifically, "20 policies were set up for nonrenewal, 5 for cancel, and 4 were uprated" and "Bounds was listed as the producer on nearly every policy Progressive nonrenewed, cancelled, or uprated." [71], Ex. 2 at p. 9. To be clear, Bounds disputes the accuracy of Progressive's conclusions and takes issue with the manner in which this portion of the investigation proceeded. Nonetheless, Paroda testified that on January 6, 2023, he met with Murphy and Flamma to discuss the full investigation results and ultimately made the decision to reinstate Renasant's ability as an agency to write Progressive policies. However, that reinstatement included a specific restriction on Bounds' access to the For Agents Only platform and indefinitely prohibited her from writing new Progressive policies. *See* [71], Ex. 2 at p. 9-11.

On January 18, 2023, Murphy met with Renasant's management team to relay Progressive's findings and its intent moving forward. The participants in that meeting on Renasant's behalf were Bill Dalton (President), Allen Maxwell (Manager of Tupelo, Mississippi office), Debbie Shempert (Sr. Vice President), and Steve Roberts (Manager of Louisville, Mississippi office). During the meeting, Murphy presented Progressive's findings and ultimately advised Renasant that the agency would be reinstated in full with the exception that Bounds would no longer be permitted to write or bind Progressive policies whatsoever.

Five days later, on January 23, 2023, Renasant terminated Bounds' employment. The same day, Dalton emailed Murphy to advise Progressive of Bounds' termination. Dalton further explained to Murphy that Renasant had "developed a plan going forward that includes two experienced producers working with [Roberts] and his staff to maintain and eventually grow [Bounds'] book of business." [80], Ex. 24 at p. 1.

This lawsuit eventually followed.[5] In her Complaint [2], Bounds asserts claims for tortious interference with contract, negligence, and gross negligence against Progressive. In short, Bounds contends that Progressive's investigation was inherently flawed, lacked credibility, and ultimately produced inaccurate results. She takes the position that Progressive's presentation of the investigation results to Renasant's management team constituted a calculated effort to ensure that Renasant terminated her employment. She also alleges that Progressive was negligent "in sending Mr. Murphy to present and discuss the results of the [ABR] with Renasant's management. It is foreseeable that presenting the audit such that it purported to show unethical conduct by [Bounds] would lead to her employment termination." [81] at p. 2.

In the present Motion [71], Progressive seeks dismissal of all claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct.

---

[5] For the sake of completeness, the Court notes that Bounds first filed suit against Renasant. Many of the deposition transcripts attached to the filings in this case were taken in connection with the litigation against Renasant. The Court notes the existence of that litigation solely for the sake of providing a full picture of the underlying background.

2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct. 2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis*

The Court will begin with Bounds' allegations of tortious interference with contract before turning to the negligence and gross negligence claims.

## I. Tortious Interference with Contract

Bounds contends that Progressive "intentionally and willfully interfered with [her] employment contract and relationship with Renasant and its actions were calculated to cause damage to [her] in her lawful business." [2] at p. 5. Specifically, she avers that Murphy "presented false and misleading information to Renasant, causing Renasant to terminate her employment. Progressive ratified and encouraged these actions." *Id*.

To prevail on a claim for tortious interference with contract, a plaintiff must prove four elements:

> (1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiff[] in [her] lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the

defendant (which constitutes malice); and (4) that actual damage and loss resulted.

*Coleman & Coleman Enterprises, Inc. v. Waller Funeral Home*, 106 So. 3d 309, 315-16 (Miss. 2012) (citations omitted).

Progressive makes three arguments in favor of dismissal—(1) "Bounds has no evidence that Progressive acted with malice or 'for the purpose of causing damage and loss;'" (2) "Bounds cannot establish the required causal connection between Progressive's actions and her termination;" and (3) "[a]ll actions taken by Progressive with respect to Bounds were privileged." [72] at p. 16-20.

A.    *Malice*

At the outset, it is noteworthy that in order to prove malice "a showing of specific intent is not required. Rather, intent can be inferred when a defendant knows a contract exists between two parties and does a wrongful act that he is certain or reasonably certain will interfere with the contract." *Coleman*, 106 So. 3d at 316 (quoting *Neider v. Franklin*, 844 So. 2d 433, 437 (Miss. 2003)) (additional citation omitted). This case law underlies Bounds' contention here—that Progressive employees knew that she had an employment contract with Renasant yet still presented false and/or misleading information to Renasant's management team which ultimately led to her termination.

For its part, Progressive's position is simple—it contends that "there is zero evidence that [it] acted maliciously when it reviewed its policies for accuracy and revoked Bounds' authority." [72] at p. 1 (emphasis omitted). It contends that part of its regular business practices involves monitoring and reviewing policies to ensure compliance with its underwriting requirements. Attached to Paroda's declaration is a document that explains Progressive's commercial auto underwriting guidelines. Those guidelines provide that the For Agents Only platform allows an

10

agent "to quote and bind in minutes" but that Progressive does "audit bound policies for compliance with [its] underwriting and binding standards." [71], Ex. 2 at p. 26.

According to Progressive, that is precisely what happened in this case. Paroda testified that in mid-2022, Renasant "was flagged as was Ms. Bounds in a general audit that we had been looking into for the State of Louisiana with -- in regards to dirt, sand and gravel policies being written or dirt, sand and gravel risks being written as excavators. . . [T]hat particular request for the audit was -- was statewide. It was not looking at any particular agency. We had simply looked -- we were looking at policies that were potentially written incorrectly." [80], Ex. 4 at p. 19. Richard Glavan's email of August 10, 2022 notes his conclusions as to many policies being improperly classified. *See id.*, Ex. 9 at p. 1. Glavan also points out in that email that he noticed a "few policies" where Renasant (with Bounds as the agent) started a new policy as an excavation risk when the insured previously had an active policy with a different agency that was rated as DSG. *Id.*

Acting on this information, Paroda simply took further action and ultimately directed that a full ABR of Renasant be conducted. When the initial results of the ABR revealed concerning results, Progressive decided to suspend Renasant from writing new policies for a period of 60 days while it conducted policy-level audits, which involved Progressive making contact with individual insureds.

In his November 14, 2022 email advising Steve Roberts of the suspension, Murphy advised him that Progressive had "discovered several red flags indicative of gaming." [80], Ex. 13 at p. 2. Ultimately, of the 67 policies flagged for a more detailed review, 29 policies required further action, including, according to Paroda, 20 policies being set up for nonrenewal, 5 policies set to cancel, and 4 policies being uprated. Progressive was of the opinion that its underwriting policies had been habitually violated. Because Bounds was the agent listed on almost all of those accounts,

Progressive determined that the appropriate course of action was to remove Renasant's agency suspension but revoke Bounds' authority to access the For Agents Only platform and bind new Progressive policies. Progressive, through Murphy, met with Renasant's management team to provide a full explanation of its decision.

Taking all of this into account, according to Progressive, its conduct was measured and appropriate considering the information that it learned in its own investigation into the matter. Progressive takes the position that it did not request Renasant to terminate Bounds, had nothing to do with that decision, and cannot be held responsible for it. Again, Progressive contends that there is simply no evidence of malice.

Bounds tells a different story and attacks Renasant's version of events on multiple fronts. To start, she contends that Progressive's investigation did not reveal what Progressive contends that it did. Beginning with Glavan's 40-policy review, Bounds points out that Glavan himself testified that his conclusions at that point were not definitive. In particular, Glavan testified:

> None of this here is definitive. This is my opinion here. Knowing that if we really wanted to review something, we would notify the customer in writing with a review to be had. So this was just preliminary thoughts, preliminary reviews. And whatever information leadership took from this spreadsheet, it was their decision. I just gave my full formed opinion based on what I reviewed.

[80], Ex. 8 at p. 7.

According to Bounds, despite Glavan's admission that his conclusions were only preliminary, Paroda treated them as conclusive. Taking the information Glavan provided, Paroda immediately emailed Murphy, Carrie Poindexter (who also worked in Progressive's underwriting department), and Flamma, noting that "[q]uite a few policies are misclassified, and [underwriting] called out Renasant for gaming." [80], Ex. 29 at p. 1-2. Bounds contends that when considered in

light of Glavan's testimony that his findings were only preliminary, Paroda's statement in this email was inaccurate as there was no proof that she had engaged in gaming nor was there any proof that underwriting had called Renasant out for gaming.

Bounds asserts that Paroda's misrepresentations continued after the investigation was completed. She emphasizes a note Paroda shared with his team in advance of a Microsoft Teams meeting in early January 2023 where Paroda stated the following regarding Renasant: ". . . an increase of almost 2M since 2021 . . . but much of the growth is driven by misrep'd policies and stealing from other agencies (so not real growth for us) . . . [t]ime to say goodbye?" [71], Ex. 2 at p. 72. Bounds contends that Paroda's representations are incorrect as Progressive's investigation did not actually support the conclusion that Renasant (or Bounds) had stolen from other agencies or misrepresented policies. Again, she contends that this illustrates Paroda's underlying desire to spread a false narrative about her to have her terminated.

As to the quote iterations upon which Progressive relied, at least in part, in reaching its decision, Bounds testified as follows via declaration:

> I never made even close to 21 quote iterations in a single day for an insured. I never submitted to Progressive any application for insurance that I knew or had reason to know was false, inaccurate, or misleading. Progressive never provided me with an opportunity to remediate any issues that it saw with my underwriting or provided an opportunity to view the audit and to get additional information from the insureds to verify the policy classifications, aside from the August 29, 2022 email. My response to this email was summarily rejected.

[80], Ex. 1 at p. 3.

As this explanation indicates, Bounds disputes—with competent summary judgment evidence—the veracity of the underlying findings from Progressive's investigation. Additionally,

it is noteworthy that Paroda testified that "iterations aren't necessarily the issue. It's whether or not the policy is written accurately as well as the rewrites." [80], Ex. 4 at p. 38.

Bounds also takes issue with Progressive's decision to have Murphy deliver the results of its investigation to Renasant. She points out that Murphy had only begun working as an Agency Sales Representative in May 2022 and thus was still learning certain aspects of the job at the time he presented Progressive's findings to Renasant's management team. In her view, he was unequipped for the task. Specifically, she points to Murphy's testimony that, despite having previously advised Renasant that Bounds' conduct was "indicative of gaming" and having shared a spreadsheet to support that point with Renasant's management team, he consulted with Mitrovic while waiting on his flight because he "wanted to understand what that Excel sheet that I sent out, what it really meant." [80], Ex. 12 at p. 15. Murphy continued on to testify that he wanted Mitrovic to "really articulate exactly what that Excel spreadsheet or his audit entailed or disclosed[.]" *Id.* Bounds contends that this is indicative of Murphy not fully understanding what he was presenting to the Renasant management team but instead seeking to accomplish the goal of having her terminated.

Moving on to the meeting itself, Bounds takes further issue with Murphy's conduct. She points out that Debbie Shempert's handwritten notes from that meeting reflect the term "rogue producer." [80], Ex. 19 at p. 2. While those handwritten notes are unsworn and have not been verified by Shempert, the Court also notes that while he was meeting with Renasant, Murphy emailed Christina Anderson, another employee of Progressive, and stated as follows:

> Hey Christina! I am meeting with Renasant the agency we had the call on. We landed on restricting access for the 1 rogue producer. Is there a way to remove her current access from [For Agents Only]?

[80], Ex. 20 at p. 1.

14

This email, according to Bounds, gives credence to her theory that Murphy had indeed referred to her as a rogue producer during the meeting. Notably, Murphy used the same "rogue producer" term when referring to Bounds in a separate email two days later. *See* [80], Ex. 21 at p. 1. Of course, Bounds contends that she was not a "rogue producer" but that she at all times complied with Progressive's underwriting requirements.

Further, Bounds takes issue with the manner in which Progressive communicated with the insureds and the conclusions that Progressive took from those communications. She points out that if an insured did not respond to the questionnaire within 15 days, then that particular insured was deemed a "no response" and held against her in the investigation process. Bounds contends that this is further evidence that Progressive was not necessarily interested in determining the truth but instead simply desired for her to be terminated.

Bounds ultimately argues that a reasonable jury could conclude that Paroda, who had recently been hired into the Product Manager position, was taking whatever steps were necessary to "ensure that Progressive hit its target profits in Louisiana and make a name for himself by exposing alleged gaming. He needed a scapegoat for the Louisiana problem and picked Christy. He promoted his false narrative . . . and Progressive destroyed Christy's career by having her fired by Renasant." [81] at p. 28. Taking all of the underlying facts into account, the Court agrees. Questions of fact remain as to whether Progressive's conduct was malicious. In reaching this conclusion, the Court, in addition to the points addressed previously, finds telling Paroda's admissions as to the lack of evidence to support his conclusion that Bounds was dishonest:

> Q.      . . . You don't have any information that specifically proves
>         that Christy Bounds committed fraud, do you?
>
> . . .
>
> A.      Yeah, I don't know if I can answer that specifically.

[80], Ex. 4 at p. 41.

Again, having considered the evidence in the light most favorable to Bounds, the Court finds that a reasonable jury could find that Progressive's conduct at issue here constituted wrongful acts that Progressive was certain or reasonably certain would interfere with Bounds' employment contract. *See Coleman*, 106 So. 3d at 316. That is sufficient for purposes of this stage of the proceedings. *See*, *e.g.*, *Pippen v. Tronox, LLC*, 359 F. Supp. 3d 440, 443 (N.D. Miss. Jan. 14, 2019) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). The Court therefore rejects Progressive's request for summary judgment on the issue of whether its conduct was malicious.

>    B.    *Causal Connection*

To succeed on a tortious interference with contract claim, a plaintiff also must establish that the "defendant's conduct caused the loss." *Freeman v. Husman Oil Int'l, Inc.*, 717 So. 2d 742, 744 (Miss. 1998) (citing *MBF Corp. v. Century Business Comm's, Inc.*, 663 So. 2d 595, 598 (Miss. 1995)).

Progressive contends that Bounds cannot meet the requisite threshold because she has nothing to connect Progressive's actions and her termination. The premise of this argument is that it was Renasant—not Progressive—who employed Bounds and ultimately made the decision to terminate her employment. Progressive also points to the deposition testimony of Bill Dalton, who testified that Renasant had previously had performance issues with Bounds in connection with another insurance carrier, Liberty Mutual, and a separate error when she listed the wrong insured on a policy. *See* [80,], Ex. 14 at p. 7, 9.

The Court need not expend considerable time addressing Progressive's argument as it can be easily rejected. While true that Progressive did not make the ultimate termination decision,

Dalton specifically testified that despite Bounds' previous employment issues, he had given her the benefit of the doubt *until the meeting with Murphy*:

> Q.     At some point that obviously -- as far as giving the benefit
>        of the doubt, that obviously ran its course, right?
>
> A.     On January the 18th with me.

*Id.* at p. 6.

Thus, Dalton himself testified that the meeting with Murphy was the catalyst for his decision to terminate Bounds' employment. Additionally, Leslie Ausbon, who is over HR at Renasant, testified that she did not attend the January 18, 2023 meeting but that the Renasant management team met with her after that meeting to walk through their intent to terminate Bounds' employment. *See* [71], Ex. 16 at p. 4. Allen Maxwell, who again managed the Tupelo office, specifically testified that "*[b]ased on the findings from Progressive*, the decision was made to terminate [Bounds'] employment." [80], Ex. 23 at p. 3 (emphasis added).

A reasonable jury could conclude that Progressive's conduct "caused the loss." *See Freeman*, 717 So. 2d at 744. Progressive's request for dismissal on this basis is squarely rejected.

C.     *Privilege*

While Mississippi law recognizes tortious interference with contract claims, there is an exception—"a person occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and absent bad faith, to interfere with the principal's contractual relationship with a third person." *Guest-White v. Checker Leasing, Inc.*, 2016 WL 595407, at *5 (N.D. Miss. Feb. 11, 2016) (citing *Morrison v. Miss. Enter. For Tech.*, 798 So. 2d 567, 574 (Miss. Ct. App. 2001)).

Here, Progressive contends that, by virtue of the Producer's Agreement it had with Renasant, its actions are privileged and therefore insulated from liability.

17

While the Court is cognizant of Progressive's contractual relationship with Renasant, a third-party's privilege to interfere with a contract does not apply where the actions "were taken in bad faith." *Id*. Although it is not necessary for direct evidence of bad faith to exist, the reviewing court's conclusion "must be that the actor was malicious or recklessly disregarding the rights of the person injured." *Id*. (citing *Morrison*, 798 So. 2d at 575; *Stephen v. Winston Cnty., Miss.*, 2008 WL 4813829, at *8-9 (N.D. Miss. Nov. 4, 2008)).

In a preceding section, this Court has already concluded that a reasonable jury could conclude that Progressive's conduct in this case was malicious since questions of fact remain as to whether Progressive engaged in wrongful conduct certain or reasonably certain to interfere with Bounds' employment contract. The Court sees no need to again recite those points—they apply equally here. Because a question of fact exists as to whether Progressive acted maliciously, its request for dismissal based on privilege is rejected.

   D.   *Additional Matter*

Aside from having thus far rejected all aspects of Progressive's request for dismissal on the tortious interference with contract claim, the Court notes that Bounds' Complaint [2] alleges that Progressive continued its alleged tortious conduct when it interfered with her subsequent employment with the Ledkins Agency after she was terminated by Renasant. Through its Motion [71], Progressive also seeks summary judgment on that tortious interference with contract claim. However, Bounds did not respond to any of Progressive's arguments on that point in her Response Memorandum [81]. She has therefore abandoned that claim. *See*, *e.g.*, *Tubwell v. Specialized Loan Serv., LLC*, 2019 WL 1446362, at *3 (N.D. Miss. Mar. 29, 2012) (noting that the non-movant's failure to respond to the moving party's motion for summary judgment on certain claims "amounts to an abandonment of [those] claims").

18

Therefore, to the extent that Bounds brings a tortious interference with contract claim premised upon Progressive's alleged interference with her terminated employment with the Ledkins Agency, summary judgment is GRANTED. Progressive's request for summary judgment is otherwise DENIED in all respects.

## II.    Negligence

In her Complaint [2], Bounds alleges that "Progressive owed a duty of care to [her] not to provide false and misleading information to Renasant about [her]" and that it "was foreseeable that providing false and misleading information . . . would result in Renasant deciding to end its business relationship with [her]." [2] at p. 6.

To prevail on a negligence claim, a plaintiff must establish four elements: duty, breach, causation, and damages. *Darling Ingredients Inc. v. Moore*, 337 So. 3d 214, 216 (Miss. 2022). "Once a plaintiff has shown that a duty was owed, the elements of breach and proximate cause must be established . . . with supporting evidence. Duty and breach of duty, which both involve foreseeability, are essential to finding negligence and therefore, must be demonstrated first." *Id*. (citations and internal punctuation omitted).

Progressive makes two separate arguments in favor of dismissal of Bounds' negligence claim. First, Progressive raises a statute of limitations defense, contending that the negligence claim "improperly disguises an untimely defamation claim as one for negligence." [72] at p. 25. Secondarily, Progressive contends that the claim fails on the merits.

### A.    Statute of Limitations

Progressive's argument on this point is straightforward. It contends that the crux of Bounds' allegations is that it provided false information about her to Renasant and that such a claim is one for defamation—not negligence. The classification of the claim as either one for

19

defamation or negligence is critical here due to the date when the lawsuit was filed. Bounds filed her Complaint [2] approximately fifteen months after her termination. In Mississippi, defamation claims are subject to a one-year statute of limitations whereas negligence claims are subject to a three-year limitations period. *See* Miss. Code Ann. §§ 15-1-35; 15-1-49. Thus, if the claim is one for defamation, it is time-barred.

To support its position that the claim is one for defamation, Progressive relies heavily on the Mississippi Supreme Court's relatively recent decision in *Dollar Gen. Corp. v. Dobbs*, 409 So. 3d 569 (Miss. 2025). There, the plaintiff (Bradley Dobbs) was inside a Dollar General store when the store manager (Devan Callahan) demanded that Dobbs "get out of the store" and told other customers in the store that Dobbs had to leave the store because he had been caught shoplifting from the store in the past. *Id*. at 571. Dobbs defended himself and told Callahan that she must be misidentifying Dobbs because the allegation was inaccurate. *Id*. Ultimately, it turned out that Dobbs was correct—Dollar General had no proof that he had been caught shoplifting. *Id*. Two years later, Dobbs filed suit against Dollar General, alleging in pertinent part that Callahan's conduct was "negligent in that she publicly falsely accused [him] of the crime of shoplifting after failing to identify him or exercis[e] reasonable care to assure the accuracy of her charges[.]" *Id*.

Dollar General sought dismissal on the basis that Dobbs' negligence claim was actually one for defamation and subject to a one-year limitations period and, therefore, time-barred. *Id*. The trial court denied Dollar General's request for dismissal, but the Mississippi Supreme Court reversed that decision on interlocutory appeal. *Id*. In doing so, the court noted that "even though Dobbs chose to assert claims for negligence, his complaint 'factually sounds in slander and is subsequently barred by the one-year statute of limitations.'" *Id*. at 573 (quoting *Sanderson Farms, Inc. v. McCullough*, 212 So. 3d 69, 71 (Miss. 2017)). The court also emphasized that "the *only*

wrongful conduct Dobbs alleges in his complaint is that Dollar General publicly falsely accused him of shoplifting . . . subjecting him to false accusations in the presence of numerous shoppers and his grandchild." *Id*. at 574 (emphasis in original; quotation marks omitted). Ultimately, the court held that "substance prevails over form" and while there was a certain amount of negligence underlying Dobbs' allegations, the crux of his contentions against Dollar General sounded in slander—not negligence. *Id*. at 575.

> Reverting to the specific allegations in Bounds' Complaint [2], she alleges as follows:

>> Progressive undertook to evaluate Ms. Bounds['] rating and classification of its insureds and to communicate its findings to Renasant management. Progressive falsely and inaccurately accused Ms. Bounds of gaming before the review of her accounts was even completed. Progressive also suspended Renasant's accounts based on a cursory review of Renasant's accounts without meaningful investigation. Progressive owed a duty of care to Ms. Bounds not to provide false and misleading information to Renasant about Ms. Bounds[.] It was foreseeable that providing false and misleading information to Ms. Bounds'[] employer would result in Renasant deciding to end its business relationship with Ms. Bounds.

[2] at p. 6.

According to Progressive, these allegations can be likened to the claims at issue in *Dobbs* and should ultimately be considered a time-barred defamation claim. The Court disagrees. In particular, the Court finds noteworthy that the store manager's false public allegation against Dobbs as "the *only* wrongful conduct" at issue in the case. *Dobbs*, 409 So. 3d at 574 (emphasis in original). Here, Bounds' allegations are broader. While Bounds does allege that Progressive falsely and inaccurately accused her of gaming, her allegations go further as she also contends that Progressive's investigation itself was flawed, yielding inaccurate results. For instance, the facts section of the Complaint [2] alleges that Murphy misrepresented the investigation results to Renasant because he himself did not understand the information. She also alleges that

Progressive's reliance on the investigation findings were erroneous and that Progressive knew or should have known as much. She also takes issue with Progressive's initial suspension of Renasant's authority to write new policies "based on a cursory review of Renasant's accounts without meaningful investigation." [2] at p. 6.

In sum, the plaintiff's allegations in *Dobbs* were narrow—the store manager publicly making a false statement about him. Here, while Murphy allegedly made false statements about Bounds to the Renasant management team, the allegations here encompass a much wider range of conduct. As the Mississippi Supreme Court phrased it, "substance prevails over form." *Dobbs*, 409 So. 3d at 575. Here, the substance of this claim sounds as one for negligence—not defamation. Progressive's argument for dismissal on this basis is rejected.[6]

B.    *Merits*

Progressive next argues that Bounds' contention that it owed her a duty to not provide false and misleading information fails on the merits because "there is no precedent for the imposition of such a broad, undefined duty under Mississippi law[.]" [71], Ex. 1 at p. 26.

Although neither party cites it (or any significant case law on this point whatsoever), the Court finds instructive its previous decision in *Brown v. Cooper Tire & Rubber Co.*, 2015 WL 4477564 (N.D. Miss. July 22, 2015). There, the plaintiff, Eric Brown, was employed as a utility person at Cooper Tire. *Id.* at *1. Pursuant to OSHA requirements, Brown, like all employees at the

---

[6] Bounds also raises an alternative argument that, even if the claim is considered a defamation claim, it is still timely based on the discovery rule. She points out that she did not have access to much of the information underlying Progressive's internal investigation until discovery in the Renasant litigation when she received it from Progressive via subpoena in May 2023. She contends that she did not learn of the "rogue producer" allegation until she received Renasant's written discovery responses in that litigation in June 2023. She provided a copy of those discovery responses. See [80], Ex. 26 at p. 4. This lawsuit was filed in April 2024—less than a year after she received either of these documents. Even if the Court had determined that this claim was one for defamation, it would still conclude that a question of fact remains as to whether it was timely filed based on the discovery rule.

tire plant, was required to undergo an annual hearing test "in order to determine whether [the] work environment caused significant hearing loss[.]" *Id*. Cooper Tire contracted with T.K. Group to administer the required hearing tests. *Id*. Although Brown's 2011 annual test went off without incident, in 2012, Brown was initially tested and then retested because his initial results were allegedly "all over the board" which was "an indication that he was repeatedly pressing the button" during the test. *Id*. The Court explained the events surrounding the retest and subsequent termination as follows:

> In any event, it is undisputed that Cooper Tire decided to proceed with a retest of Brown, which took place on October 9, 2012 and was conducted by technicians Billy Williams and Janelle Williams. Following the retest, [Monica] Hauss[, who worked in Cooper Tire's HR department,] testified that one of the technicians again stated that Brown's results were "all over the board" and that when this happens, it is usually a sign of someone "constantly hitting the button." Both Billy Williams and Janelle Williams deny making such a statement.
>
> After the retest, Hauss reported the issues with both of Brown's tests to Cole Goodson, the plant's Production Manager, explaining, in Goodson's words, that she and the technicians felt "like he was falsifying the information . . . and just hitting the button." Goodson conducted a subsequent investigation into the hearing tests and then terminated Brown on October 22, 2012.

*Id*.

In addition to an ADA claim against Cooper Tire, Brown asserted tortious interference with contract and negligence claims against T.K. Group on the basis that "the company's technicians caused his termination by communicating to Monica Hauss that he falsified his hearing tests." *Id*. at *5.[7] This Court recognized the negligence claim and noted that T.K. Group "was required to act

---

[7] The Court notes that this quoted allegation is contained in the portion of the decision addressing only the tortious interference with contract claim; however, the Court later pointed out that the "negligence claim against T.K. Group [was] based upon the same conduct giving rise to [the] tortious interference claim." *Id*. at *6.

as a reasonable and prudent company would have under the same or similar circumstances." *Id*. at *6 (citations and quotation marks omitted). The Court went on to conclude that Brown presented sufficient evidence to survive summary judgment as to whether T.K. Group breached that duty since "three out of the four technicians testified that they were not qualified to interpret tests . . . [yet] at least two technicians accused him of falsifying hearing tests" which ultimately led to his termination. *Id*.

Although the underlying facts are distinguishable from those in the case *sub judice*, the recognition of a legal duty on the part of a third-party is important. Here, as was the case in *Brown*, Bounds takes the position that the third-party (Progressive) was required to act in a reasonable and prudent manner and that it failed to do so when it conducted a flawed investigation and presented false and misleading information about her to Renasant, which ultimately led to the termination of her employment. Progressive has provided no authority to indicate that the Court's conclusion in *Brown* was incorrect, and the Court sees no basis to reach a different outcome here.

Next, Progressive contends that Bounds has no evidence to establish that Progressive did not act in a reasonable and prudent manner—in other words, it takes the position that she cannot show that any duty was breached. While the Court recognizes Progressive's position that it simply relied on the results of its investigation and relayed those results to Renasant, Bounds has pointed to evidence to the contrary. In particular, Bounds has pointed to competent summary judgment evidence to rebut the underlying investigation results, as well as evidence that Murphy presented that information to Renasant in an imprudent manner. She has come forward with sufficient evidence to preclude summary judgment on that point.

Progressive also argues that Bounds "cannot point to any evidence showing Progressive's actions caused her termination." [72] at p. 28. The Court addressed Progressive's causation

argument when analyzing the tortious interference with contract claim. The same logic applies here. The Court specifically notes the testimony of Dalton and Maxwell, both of whom testified that the January 18, 2023 meeting, where, viewing the evidence in the light most favorable to Bounds, Murphy presented false and misleading information about her conduct, was the catalyst for the decision to terminate Bounds' employment. This is sufficient to preclude summary judgment.

To the extent Progressive's Motion [71] seeks dismissal of Bounds' negligence claim, it is DENIED.

### III.    Gross Negligence

"Gross negligence is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them." *McDonald v. Lemon-Mohler Ins. Agency, LLC*, 183 So. 3d 118, 126 (Miss. Ct. App. 2015).

Arguing in favor of dismissal of this claim, Progressive notes that the standard for a gross negligence claim is higher than for an ordinary negligence claim. Progressive avers that "Bounds cannot prevail on her gross negligence claim because she cannot show Progressive acted willfully, wantonly, or with reckless disregard of the consequences to her." [72] at p. 23 (citation omitted). It then goes on to incorporate the arguments it raised in favor of dismissing the ordinary negligence claim.

Although the Court is aware of the higher burden that a plaintiff must establish to prevail on a gross negligence claim as compared to an ordinary negligence claim, Progressive has pointed to no *specific* evidence to support dismissal of the gross negligence claim—other than those already rejected in the analysis of the ordinary negligence claim.

Thus, the same outcome is warranted here. To the extent Progressive's Motion [71] seeks dismissal of the gross negligence claim, it is DENIED.

*Conclusion*

For the reasons set forth herein, Progressive's Motion for Summary Judgment [71] is GRANTED IN PART and DENIED IN PART. As to Bounds' tortious interference claim based upon Progressive's alleged interference with her employment at the Ledkins Agency, the Motion [71] is GRANTED. The Motion [71] is DENIED in all other respects. Bounds will be permitted to proceed to trial.

The parties shall have 21 days to file their respective memorandums pertaining to the restriction/redaction issue.

SO ORDERED, this the 23rd day of February, 2026.

/s/ Sharion Aycock
SENIOR UNITED STATES DISTRICT JUDGE